UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No: 17-40151 |
| JOHNSON & WALES UNIVERSITY, | ) |
| | ) **JURY TRIAL DEMANDED** |
| Defendant. | ) |
| | ) |

_____

### VERIFIED COMPLAINT

Plaintiff John Doe (hereinafter "John")[1], by and through his undersigned counsel, files this Complaint and in support thereof alleges as follows:

### INTRODUCTION

1.   This lawsuit arises from the miscarriage of justice caused by the actions taken by Johnson & Wales University ("JWU" or "the University") against the Plaintiff ("John") in October and November of 2017.  In the Fall of his junior year he was accused having committed sexual assault, when as a sophomore, he had engaged numerous times in consensual sex with a female student who suddenly now claimed to have withdrawn her consent during the course of the sexual conduct.  This disciplinary action was taken against a male student with an unblemished academic and disciplinary record in a time of near viral hysteria regarding campus sexual assaults.

2.   In just five weeks from the date the complaint was formally filed against him, the plaintiff was found guilty of sexual assault, expelled from the University, removed from the campus and branded a sex offender, with his entire future in ruins. The defendant university's

_____
[1] Contemporaneously with this Complaint, Plaintiff has filed a Motion for Permission to Proceed under Pseudonym.

actions are the direct result of a foundationally flawed process of investigation and discipline during which the plaintiff was denied the most basic elements of fairness promised to him by JWU in its *Student Handbook*.

3.   In filing this lawsuit, the plaintiff seeks to right these grave wrongs, finish his education, restore his reputation and find some semblance of emotional and psychological well-being.


## JURISDICTION AND VENUE

4.   This action arises out of the University's breach of its contractual and other obligations to the plaintiff, as well as violations of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681).

5.   The plaintiff is a resident of Massachusetts.

6.   The defendant is a Rhode Island non-profit corporation which is also registered with the Massachusetts Secretary of State and which maintains a campus and educational facility in Rehoboth, Massachusetts and owns land upon which such facility sits.

7.   This Court has jurisdiction pursuant to 28 U.S.C. § §1331 and 1332.

8.   Venue is proper under 28 U.S.C. § 1391(b) and (c) because both parties reside in Massachusetts under such statute.


## PARTIES

9.   The Plaintiff, identified here as John Doe, resides in Massachusetts and was formerly

a full-time student at Johnson & Wales University. He was improperly expelled in November of

2017, while in his junior year at the University.  The plaintiff began matriculation at JWU in the

fall of 2014.

10. The defendant Johnson & Wales University is a federally-funded, private liberal arts

University with a campus and educational facility in Rehoboth, Massachusetts.[2]


## FACTUAL BACKGROUND

11. The proceeding by JWU against John Doe which gives rise to this lawsuit formally

began in September of 2017 when Mary Smith[3] filed a formal Complaint ("Complaint Report")

with JWU accompanied by her boyfriend BK.

12. JWU *never did and would not* give a copy of the formal 18+ page Complaint Report

to John Doe and only read it to him in a single pre-disciplinary Hearing meeting with Betsy Gray

(the JWU "Director of Student Conduct & Program").  Indeed, JWU refused to give a copy of

the Complaint Report to the undersigned counsel when his office requested it when he began

representing John Doe in his internal appeal of his expulsion.  Undersigned counsel was forced

to have it read to him telephonically and told to take notes to the best of his ability.  The

undersigned facts and quotes come from that report. It is this report that guided the Hearing.

Upon information and belief, the testimony of Mary Smith matched her statements in the

Complaint Report.  Shockingly, JWU failed to make *any record whatsoever* of the Hearing

which occurred against John Doe.[4]

---

[2] JWU also has a campus in Providence, R.I., along with campuses located in North Miami, FL., Denver, CO. and Charlotte, N.C.

[3] Mary Smith is a pseudonym being used to protect this student's privacy. This complaint will identify other students through the use of initials, in order to protect their privacy.

[4] JWU, in essence, expelled John Doe leaving him no reasonable ability to appeal internally. How can an accused appeal an expulsion arising from a Hearing when no record of what occurred at the Hearing exists? He can't. JWU's

**Mary Smith and John Doe's relationship**

13. Mary Smith and John Doe had become friends since the beginning of the 2016 school year and spent time together.  They never dated and, as Mary Smith stated, they were "friends with benefits." They began having consensual sex together soon thereafter.   It also appears that she was dating BK at the same time she was sleeping with John Doe. John Doe had no knowledge of this dating relationship. They had sex together a total of six times.  Four of those times occurred at John Doe's dorm and two at her dorm.  These sexual encounters occurred during September and October of 2016.

**Asserted sexual assault incident 1 as stated by the complainant Mary Smith (sex session 5)**

14. Mary Smith on or about September 13, 2017 reported to the JWU security office that she had been sexually assaulted.  She stated that this assault occurred "one night in October" *of 2016* by John Doe. She stated that she had slept with John Doe earlier that night in his dorm room, was sleeping with him in bed, and woke up to go to the bathroom in the middle of the night. While in the bathroom she said that John Doe followed her into the bathroom pulled down her underwear and had sex with her up against the sink, leaving her with bruising on her hip. She said that this sexual encounter was rougher than she was used to having with him because John Doe was "normally gentle with her" when they had sex.

15. After they finished having sex in the bathroom, Mary Smith and John Doe went back into John Doe's bed and fell asleep together *again*.  She woke up later that morning and left the room.  As stated in the Complaint Report, one of John Doe's roommates was in the room when

---

failure to provide a written copy of the Complaint and make a record of the Hearing is at best bad faith and at worst an intentional cover-up.

this alleged sexual assault occurred and heard nothing.  Additionally, according to the Complaint Report, another roommate was walking in when Mary Smith was leaving the building and she seemed to be in good spirits. [5]

16. Mary Smith never took pictures of any bruising, never contacted any official regarding the incident and never went to any medical facility.

**Asserted sexual assault incident 2 as stated by the complainant Mary Smith (sex session 6)**

17. Approximately a week after this alleged first sexual assault by John Doe, Mary Smith *voluntarily came over* to John Doe's dorm room *again* to have sex with him.  She stated in the Complaint Report that she began having "consensual sex" with John Doe but stated that "it was normal at first and not rough and at some point during the consensual sex she became less lubricated and it started to hurt." She "voiced this to John Doe and gave him the chance to stop and change positions to see if it continued to hurt. She stated that he moved her onto her hands and knees and continued having sex." It did not hurt anymore in that position but "began to hurt again" and he only stopped when he ejaculated.

18. It is undisputed that the events relayed in Paragraphs 15 and 16 are what the entire assertion of "sexual assault" against John Doe comprises as stated by Mary Smith.  Nothing more.

19. When she made the formal complaint *approximately a year later*, as stated in the Complaint Report, Mary Smith said that she was not sure it was sexual assault that occurred. She said that "she was confused because he had never gotten rough with her like that before and that

---

[5] Very disturbingly, JWU never had these two roommates as witnesses at the Hearing and John Doe was never able to question them, yet their exculpatory statements are in the Complaint Report.

she was not sure if what occurred was considered sexual assault. She stated that 'this type of sex was new to her."[6]

20. Soon after this asserted second incident of sexual assault occurred, Mary Smith was on social media platform Instagram liking John Doe's postings.

**JWU begins flawed Investigation of John Doe**

21. On or about June 1, 2017 (approximately 8 months after the alleged incidents occurred), Mary Smith's boyfriend, BK, on his own volition and without any knowledge of Mary Smith went to the JWU security office and stated that his girlfriend "was sexually assaulted on 2 separate occasions during the prior school year."  BK further stated that he and Mary Smith had been dating "exclusively since January of 2017" but had been in a "relationship" prior to that.

22. BK stated that she was assaulted in "late September to early October" but that she never wanted "to get into any details" with him about it. BK stated that he just "found out about the sexual assault in April or May." BK also stated that he never told Mary Smith that he was going to report anything. BK also stated that Mary Smith would be moving into his apartment for the upcoming school year (beginning in August/September 2017). Officer Eastman of JWU security stated that he was obligated to investigate.

23. BK stated that he did not know the precise name of the person who assault his girlfriend but that his first name was "John Doe" and the dorm that John Doe had lived in.

24. Sgt. Robinson of JWU security proceeded to reach out to Mary Smith and John Doe regarding this alleged complaint filed by BK.

25. Sgt. Robinson spoke telephonically with Mary Smith regarding what allegedly

---

[6] John Doe has denied from the beginning that any "sexual assault" occurred and that sex session 6 was not distinct from session 1 through 4. He further has always claimed that the bathroom sex (session 5) never even happened. Indeed, Mary Smith's complaint and testimony does not even describe sexual assault.

occurred. She stated, as relayed in the Complaint Report, that "she did not want to talk about it at

the moment." Sgt. Robinson persisted and asked if she "would validate the complaint." Mary

Smith would not do so and said that "she had to go."

26. Sgt. Robinson proceeded to email Mary Smith on June 2, 2017, informing Mary

Smith that she was "a victim of sexual assault this past academic year (2016-2017)" and that he

"would like her to know that we are here to support you". Mary Smith responded to that e-mail

on June 7, 2017 thanking Sgt. Robinson "for reaching out to her" and that "she did not need any

help."

27. Sgt. Robinson also reached out to John Doe who unequivocally denied that a sexual

assault had occurred.

**Mary Smith moves in with BK, Complaint suddenly moves forward and John Doe is
expelled with exceptional speed**

28. On or about September 13, 2017, Mary Smith with BK went to the JWU security

office and asked to bring a formal complaint against John Doe as a consequence of sex sessions

5 and 6. She relayed the events to have occurred as delineated in the Complaint Report.

29. BK proceeded to state that he first learned about the asserted sexual assaults when he

saw the bruises on Mary Smith.[7] Mary Smith never explained why her story changed from June

to September (and no inquiry was even attempted by JWU). But Mary Smith did state that the

alleged assaults had changed her life in one way – "it had affected her relationship with her

boyfriend" (BK).

30. John Doe proceeded to receive a letter dated September 29, 2017 from Betsy Gray

---

[7] JWU apparently ignored the fact that BK had previously stated back in June to JWU security that he first found out about the assaults in April or May of 2017. Of course, John Doe had no way to examine this inconsistency because John Doe was not allowed to question BK as a witness; shockingly, BK was actually Mary Smith's "Advisor" during the expulsion Hearing.

(Director of Student Conduct and Programs at JWU) informing him that he was "being charged" with "Sexual Assault (including rape, fondling, incest and statutory rape)" and "Sexual harassment". A copy of the September 29th letter is attached as Exhibit A.

31. On October, 3, 2017, John Doe appeared at a "Pre-Hearing Conference". This Conference meeting is the only time that John Doe was actually told what the specific charges in the Complaint Report were against him. But John Doe was not allowed to read the Complaint Report, see a copy of it, or have any copy of it whatsoever.

32. At the Pre-Hearing Conference he was told that he must attend a Hearing on the charges on October 20, 2017. He was never told how the Hearing was conducted. He was never told how and if he could question any witnesses, bring any witnesses, bring and/or submit any evidence, whether there would be opening statements or closing statements. In essence, he was left in the dark about the entire procedure. The one thing he was told was that he could have an "Advisor" who could not participate in any way during the Hearing but could sit next to him. He also was never told the names of the three adjudicating Panelists. He was specifically told that he could not have any legal counsel.

33. John Doe was simply told that the procedure would follow the JWU Student Code of Conduct ("SCC") and its Conduct Review Process ("CRP"). A copy of the SCC is attached as Exhibit B and a copy of the CRP is attached as Exhibit C.

34. On October 20, 2017, John Doe was placed into an expulsion Hearing with no good faith and equitable due process of any kind in which he was being adjudicated under the absurdly low standard of "preponderance of the evidence".

35. On October 23, 2017, John Doe received a letter stating that the three adjudicating Panelists has ruled that he had committed sexual assault and he was expelled.  A copy of the Dismissal Letter is attached as Exhibit D.

36. John Doe was given only three days to appeal and, according to the CRP, only if "Relevant, new information has come to light since the decision was made" and/or "The Conduct Review Process, as outlined, was not followed."

37. John Doe, with a limited extension, filed his appeal with counsel.  It was denied within a few hours by JWU's Senior Vice President of Administration with no apparent review.

38. Within a period of approximately four weeks, John Doe went from a happy, healthy, thriving student to a sexual offender who was expelled from college, all without any semblance of equitable due process or procedure.

39. Upon information and belief, nearly all JWU students punished through the CRP for sexual assault and/or sexual harassment have been males.


**JWU's Conduct Review Process**

40.  The CRP states, among other provisions, the following. It is this statement which foundationally guides the CPR:

> "The university administers the Conduct Review Process in good faith, making every reasonable effort to be fair to all involved."

41. At the Hearing on a complaint, the following are the only statements regarding any actual procedure used at such a Hearing as delineated in the CRP:

> The "panel will outline the process"; "review the incident report and/or allegations, and any supplemental information"; "hear any statements relating to the incident"; "hear or review the statements of witnesses with personal, relevant information of the incident (but other witnesses, such as character witnesses, will not be not be allowed to attend or be heard)"; and "hear or review the statements

of other relevant witnesses (and where confidentiality is a consideration, the identity of such witnesses will not be disclosed to the student)"

42.   As to sexual assault and harassment claims, the CRP specifically states the following regarding the "rights" of all parties to a complaint:

"The right to an investigation and resolution that is prompt, fair and impartial from the initial investigation to the final result as required by applicable law"

"The right to a hearing conducted by unbiased university officials who receive annual training on issues related to sexual harassment, sexual assault, sexual exploitation, dating violence, domestic violence and stalking, and how to conduct an investigation."

"The right to a hearing process that protects the safety of the parties and promotes accountability.  Hearing officers and panels use the 'more likely than not' standard to evaluate alleged violations."

"The right to present relevant materials and witnesses with personal, relevant knowledge of the incident as outlined above."

"The right to be accompanied to the hearing and any related meeting by an advisor of their choice.  The advisor may accompany the student, but may not participate in any manner.  If there is a legitimate conflict of interest related to the advisor, Student Conduct reserves the right to disqualify an advisor."

43.  The conduct review process under its own terms is supposed to be, at the very least, impartial and balanced such that the burden is not shifted against and onto the accused.  It is supposed to be a "good faith" proceeding which provides a fair, delineated and honest chance for the accused to defend himself from the charges leveled against him for sexual assault and sexual harassment.  A dismissal from a university for "sexual assault" has life-long significant negative consequences against a student and the procedure must be in good faith with such reality in mind.[8]

---

[8] The Secretary of the U.S. Department of Education within the last month has announced that the procedures similar to those delineated in JWU's CRP violate a student's due process rights through Title IX.  It is expected that the Department will be promulgating new rules that universities who receive Federal funds (such as JWU) will have to implement.  This will, most assuredly, include the right to an attorney and the use of the "clear and convincing" standard of proof.

44. JWU failed to abide by its own above delineated procedure.  <u>First</u>, John Doe was not provided any precise guidance whatsoever as to how he could defend himself at the Hearing. <u>Second</u>, the burden was hopelessly unbalanced as John Doe was foundationally presumed to have committed the acts laid out in the incident report and the complainant was presumed to be telling the truth.  <u>Third</u>, even using the unquestionably unfair "more likely than not" standard, the facts simply do not support a decision against John Doe and the Panelists ignored this standard. Additionally, new evidence buttresses the fact that the complainant simply was never assaulted or harassed.

**<u>JWU Employed an Unbalanced Procedure for John Doe's Hearing on Sexual Assault/Harassment Complaints.</u>**

45. JWU's own CRP did not and does not lay out how John Doe was to present his defense at the Hearing.  He was a young shy student confronted with serious claims he denied and was (by JWU policy) alone, scared and in the dark.  As a matter of fact, he was actually placed in a nearly bare room with a telephone speaker on the table and an "advisor" next to him who, according to the CRP, could "not participate in any manner."

46. John Doe was *never* provided any written or oral guidance as to how he could bring evidence to the Hearing (i.e. Instagram postings, texts, ect.) or if he could even bring any at all. He was never provided any written or oral guidance as to how he could bring a witness in his defense and have such witness questioned by him.  Indeed, he was never told orally or in writing whether he could question the complainant's witnesses or the complainant herself.

47.  He was never told whether he could/should prepare an opening statement or closing remarks and, even if he could, how long he could speak for.  Shockingly, he was never even given a copy of the 18+ page incident report/ complaint brought against him (not even a *redacted*

copy).  He was never even reasonably allowed to take notes while the 18+ page statement was read to him.  Quite frankly, this failure alone is inherently discriminatory to an accused who understands and learns better from reading.

48. The above failures of internal procedural due process reasonably shock the conscience because even the most rudimentary contractual relationship between parties requires a fair playing field.  JWU in the case of John Doe did not follow this basic premise and the promise of good faith of the CRP.

**The Burden was Fully Placed on John Doe as the Complainant was Presumed from the Beginning to be Telling the Truth**

49. The promise of good faith, fair dealing and a reasonable effort to be fair to all parties as stated in the CRP requires that JWU not assume that the complainant is telling the truth (i.e. is a victim of sexual assault/harassment) and that John Doe is the perpetrator.  The CRP states clearly that John Doe has "the right to an investigation and resolution that is prompt, fair and impartial from the initial investigation to the final result as required by applicable law."

50. From the beginning of the investigation JWU assumed that the Mary Smith was telling the truth and was presumed to be a victim. John Doe was assumed to be at fault. Sgt. Robinson of JWU campus security, the initial primary *investigating officer*, does not even deny this fact.  He wrote in the 18+ page Complaint Report that he e-mailed Mary Smtih on June 2, 2017, the following as his initial communication:  "I tried reaching out to you earlier but I was unable to leave a voice message.  I emailed you instead.  I did not want to delay this matter any longer so I am supplying you with some resources as it has been brought to my attention that you

were a victim of sexual assault this past academic year (2016-2017).  I want you to know that we are here to support you…"

51. Any reasonable good faith investigation does not begin with the primary investigator stating that "you were a victim of sexual assault" as Sgt. Robinson does and pledge his support. Balance and reasonableness requires a statement such as "a complaint regarding an asserted incident of sexual assault was filed" (or some derivation therein).  Further, the Complaint Report reveals that when Sgt. Robinson first spoke with Mary Smith, she said that "she did not want to talk about it" and that she was "ok".  Sgt. Robinson, rather than even discussing the nature of the complaint or facts in response to the complainant's denials, simply persisted and stated to the complainant that "she would validate the complaint."  Objectivity be damned, apparently.

52. Additionally, the CRP specifically states that the three (3) Panelists who are judge, jury and executioner in John Doe's hearing process are "unbiased university officials who receive annual training on issues related to sexual harassment, sexual assault, sexual exploitation, dating violence, domestic violence and stalking, and how to conduct an investigation."

53. Intriguingly, JWU would not provide the names of the Panelists to John Doe before his hearing.  This failure by JWU alone denied John Doe the ability to investigate and determine whether the Panelists were prejudiced, biased or had an inherent conflict of interest.  Most importantly, JWU does not provide any information on what precisely the "annual training" the Panelists receive encompasses or includes.[9]  Upon information and belief, it appears that JWU actually provides training which is inherently biased and teaches a belief that a female complainant almost always tells the truth.  It is a training regime which is inherently unbalanced against the accused such as John Doe.

---

[9] The undersigned counsel requested this training material while handling John Doe's internal appeal and he was refused access to this information.

54. Importantly, the Dismissal Letter itself reveals the bias in the decision making.  The Dismissal Letter states that, "The panelists noted that throughout the hearing, the respondent was not able to articulate specific ways in which he gained consent. Rather, he only noted that the complainant never stated that she was uncomfortable after the alleged incidents occurred. The complainant provided very specific information regarding the words and behaviors she used to convey that she did not give consent or withdrew consent." This reasoning for ruling against John Doe shows that he never had a chance.  JWU ruled against him because he could not articulate a negative while the complainant simply reiterated her story.  She says it happened and John Doe could not state how he gained consent.  How does an accused show evidence of consent when he says it never happened?  It cannot be done.  She never had to provide evidence that the events actually occurred.  The burden was all on him and that burden shift is in violation of the CRP.

**The Facts Do Not Support a Decision Against John Doe Even Under the "More Likely Than Not" Standard**

55. The testimony of Mary Smith at the expulsion Hearing apparently matched almost precisely her alleged facts stated in the Complaint Report. The Complaint Report shows the following to encompass the facts she claims rise to the level of "sexual assault" and "sexual harassment".

56. Mary Smith stated that she had consensual sex with John Doe approximately six times over a six to seven-week period of time during September through November, 2016.  Two of the sexual intercourse experiences occurred at her dorm-room and the remaining events occurred at John Doe's dorm-room.  The complainant conceded that every single time she

consented to the sex and that he was, using her words, "a gentle" sex partner.  Two of the times

(experiences 5 & 6) she stated that the sex was far rougher than she claims she was used to with

John Doe.

57. The *only* facts in dispute were the nature of those two sexual intercourse sessions (5

& 6), nothing more. Mary Smith stated that during the fifth experience of sexual intercourse,

John Doe came into the bathroom and with force had sexual intercourse with her facing forward

in the bathroom causing her bruising. She stated that she was not used to having "rough sex" like

this with John Doe and did not know how to react to it.  John Doe for his part says that the sexual

intercourse never happened like that.

58. What is *not* in dispute about that fifth sexual intercourse session (even if it did happen

at all) is that Mary Smith had had sex with John Doe very soon before the alleged fifth sex in the

bathroom that night and had fallen asleep in John Doe's bed after that fourth sex session.  It is

also not in dispute that Mary Smith voluntarily went right back into John Doe's bed and fell

asleep with him after the alleged "rough sex" in the bathroom.  It is also not in dispute that at

least one of John Doe's roommates was in the same dorm-room when the alleged fifth session

"rough sex" occurred in the bathroom. It is also not in dispute that another roommate saw Mary

Smith leave John Doe's room later that morning and she seemed to be in very good spirits.

59. And, very importantly, it is not in dispute that Mary Smith went back over to John

Doe's dorm-room approximately one week after the alleged "rough sex" fifth session and

voluntarily and consensually had sex with John Doe *again* (this is the alleged sixth sex session –

and the second incident of sexual assault).  It is not in dispute that she had consensual sex with

John Doe.  Her only alleged complaint was that mid-way through the sex it began to "hurt" and

she wanted him to change positions.  It is undisputed that John Doe changed positions as she requested and finished the sex.

60. Taking the facts as stated by the complainant at face value (which John Doe did not and does not), sexual intercourse sessions 5 & 6 do not rise under any standard as acts of sexual assault or harassment.    It is simply unreasonable to believe that the female complainant suffered an assault during consensual sex and then voluntarily entered into further sexual intercourse.  It is unreasonable to believe that John Doe's roommate would not hear anything occurring. And it is not reasonable for the complainant to go back to sleep with John Doe in his bed when she could have easily left the room. Additionally, the Complaint Report stated without equivocation that Mary Smith specifically sent an e-mail message to Sgt. Robinson on June 7, 2017, thanking "him for reaching out to her" and "indicating that she did not need any help."


**New Evidence came to light which demanded a new Hearing and which JWU ignored**

61. The CRP specifically states that relevant new evidence is a basis for appeal and should lead to a new Hearing.  John Doe in his appeal procured an Instagram posting from a few weeks after the so-called second sexual assault occurred (the sixth sexual intercourse session) wherein Mary Smith on her own volition liked a posting John Doe put on-line of a meal he prepared.  On December 10, 2016, she wrote "that looks bomb" with an emoji of fire with "#lookatthatsear" after it.

62. If the fifth and sixth sexual sessions were indeed sexual assaults, it is not reasonable that the complainant would reach out on her own to communicate with John Doe in a jovial friendly manner.  But she did because the alleged incidents were not sexual assaults.

63. Additionally, BK threatened the life of John Doe on October 21, 2017 (the day after John Doe's JWU hearing).  Since that time, a restraining Order has been issued against BK and, upon information and belief, BK was removed from all JWU campuses.

64. BK's actions are extremely relevant because it is BK who has been with Mary Smith since she came to campus security in September to file a complaint against John Doe and BK was her "Advisor" at the Hearing.

65. As the Complaint Report says, Mary Smith stated without equivocation in June of 2017 that she was fine and had no complaint against John Doe.  But, starting in September when she moved in with BK, the complainant suddenly determined that she had been assaulted and came to campus security. When asked how the alleged assaults had affected her, the complainant stated that it "had affected her relationship with her boyfriend" (BK).  A new Hearing, allowing the questioning of BK, will reveal if BK has actually unduly influenced the testimony of the Mary Smith.  BK has revealed a high level of violent uncontrolled behavior and his effect upon the proceedings against John Doe is of core relevance.


## COUNT I – BREACH OF CONTRACT

66. Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

67. At all times relevant hereto, a contractual relationship exists between JWU and John Doe through its student handbook and related Student Code of Conduct and Conduct Review Process.

68. JWU is required to act in accordance with the student handbook and SCC and CRP in adjudicating reports of alleged violations of student conduct standards. With respect to these disciplinary matters, John Doe and JWU had mutual expectations, and the contract required that

the university would follow its own rules, provide a fair and reliable fact-finding procedure, and not act arbitrarily or capriciously.

69. For all the reasons set forth above, JWU has materially breached its contracts with John Doe by failing to comply with its obligations, standards, policies, and procedures set forth in the student handbook and related SCC and CRP.

70. As a direct, proximate, and foreseeable consequence of JWU's numerous material breaches, John Doe's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages. As a result of the foregoing, John Doe is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.


## COUNT II – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

71. Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

72.  Based on the foregoing facts, JWU breached and violated the covenant of good faith and fair dealing implied in its contracts with John Doe.

73. JWU has breached its obligation of good faith and fair dealing in its investigation and response to Mary Smith's allegations, in its hearing and sanction of John Doe, and in its response to the new evidence presented by John Doe.

74. As a result of the foregoing John Doe is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT III – ESTOPPEL AND RELIANCE

75. Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

76. JWU's various standards, policies and procedures constitute representations and promises that JWU expected or should have reasonably expected would induce action or forbearance by John Doe.

77. JWU expected or should have expected John Doe to accept the JWU's offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises, including that JWU would provide John Doe with a fundamentally fair process should he be accused of a violation of the SCC.

78. John Doe relied to his detriment on JWU's express and implied promises and representations.

79. As a direct, proximate, and foreseeable consequence of the above-identified conduct, John Doe's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

80. As a result of the foregoing, John Doe is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT IV – 20 U.S.C. § 1681 (Title IX)

81. Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

82. Pursuant to Title IX of the Education Amendments of 1972, plaintiff has a right not to be subjected to university discipline where sex is a motivating factor in the decision to enforce and to impose sanctions.

83. Title IX states in pertinent part:  "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20. U.S.C. § 1681(a).

84. JWU receives federal funding under Title IX, 20 U.S.C. §§ 1681-1688.

85. As a Title IX recipient, JWU is required to comply with the requirements of Title IX as well as those regulations promulgated thereunder by the Department of Education.

86. Title IX requires that federally funded colleges, like JWU, adopt and follow grievance procedures that provide for an "equitable" resolution of Title IX complaints. 34 CFR §106.8(b). The regulations further require that "a school's procedures must accord due process to both parties involved…" See Title IX (2001) "Revised Sexual Harassment Guidance" at 22 (notice of publication at 66 Fed. Reg. 5512, Jaunary 19, 2001).

88. Pursuant to Title IX, JWU is prohibited from subjecting John Doe to a process where his sex is a motivating factor in the Defendants' decision to impose sanctions.

89. Pursuant to Title IX, JWU is prohibited from providing a disciplinary proceeding that is not adequate, reliable, impartial, and equitable, and which allows John Doe the equal opportunity to present witnesses and other evidence.

90. JWU violated John Doe's right to be free from discrimination on the basis of sex by subjecting him to an investigation and pending disciplinary proceeding marked by the aforementioned procedural flaws.

100. Such conduct is in violation of Title IX, as it is discriminatory towards John Doe on the account of his sex.

101.  As a direct and proximate result of JWU's violation of Title IX, John Doe suffered the harms described above, including, without limitation, emotional distress, loss of educational opportunities, economic injuries, and other direct and consequential damages, including physical, psychological, emotional and reputational damages.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

102. Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

103. The conduct of JWU, as described above, was extreme, outrageous and beyond the scope of common decency and was intended to cause John Doe severe emotional distress.

104. As a result of JWU's conduct, John Doe has suffered severe emotional distress for conduct which no reasonable person should be expected to endure.

## COUNT VI - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

105. Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

106. Alternatively, JWU acted negligently in breach of duties of care owed to John Doe as set out above.

## COUNT VII – INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

107. Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

108. JWU has committed numerous violations of its contractual obligations and of federal and state law.

109. John Doe's educational and career opportunities have been severely damaged. Without appropriate redress, the unfair outcome to JWU's deeply flawed process will continue to label John Doe as a predatory sexual offender, destroying his future career and life prospects, with no end in sight.

110. By reason of the foregoing, John Doe requests a declaration that: (a) the findings and sanction against John Doe made by JWU be reversed; (b) John Doe's disciplinary record be expunged and removed from his education record at JWU; (c) JWU shall provide John Doe with a notarized letter confirming that the findings and sanction have been reversed and expunged from John Doe's records; (d) JWU shall make all reasonable efforts to restore John Doe's reputation; (e) JWU shall allow John Doe to continue and finish his education at JWU.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff John Doe respectfully requests that this Honorable Court grant him the following relief:

1.  Enter the requested permanent injunction and declaratory judgment;

2.  Enter judgment for the plaintiff on each count of the Complaint and award him damages in an amount determined at trial, including attorney's fees, costs and interest; and

3.  Grant such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff John Doe hereby demands a trial by jury on all claims so triable.

Respectfully submitted,
JOHN DOE,
By his attorney,

/s/    James P. Ehrhard
James P. Ehrhard, Esq.
BBO # 651797
Ehrhard & Associates, P.C.
250 Commercial Street, suite 250
Worcester, MA 01608
(508) 791-8411
ehrhard@ehrhardlaw.com

Dated: November 15, 2017

## VERIFICATION

I declare and affirm, under the pains and penalties of perjury, that to the best of my

knowledge the allegations set forth above are true and correct.

/s/    John Doe
November 15, 2017                          JOHN DOE